# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL CENTER FOR : 
TECHNOLOGY ASSESSMENT *et al*., : 
: 
Plaintiffs, : Civil Action No.: 04-0062 (RMU)
: 
v. : Document No.: 4
: 
TOMMY THOMPSON, : 
Secretary, U.S. Department of Health : 
and Human Services *et al*., : 
: 
Defendants. : 

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

Plaintiffs International Center for Technology Assessment, Center for Food Safety, and

Sierra Club (collectively, "the plaintiffs") bring suit against Tommy G. Thompson, Secretary,

U.S. Department of Health and Human Services ("HHS"); Mark B. McClellan, Commissioner,

U.S. Food and Drug Administration ("FDA"); Stephen S. Sundlof, Director, Center for Vetinary

Medicine ("CVM"), FDA; and John Matheson, Program Officer, CVM, FDA (collectively, "the

defendants"), alleging violations of the New Animal Drug Application ("NADA") provisions of

the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360b; the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Endangered Species Act

("ESA"), 16 U.S.C. § 1531 *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §

551 *et seq*.

Specifically, the plaintiffs challenge the defendants' decision to allow unregulated

commercialization of a genetically engineered ornamental fish.  The plaintiffs also challenge the

defendants' failure to comply with NEPA and ESA while conducting programmatic actions with

respect to the regulation of all genetically engineered animals.  The defendants move to dismiss

the plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject

matter jurisdiction and 12(b)(6) for failure to state a claim on which relief can be granted.  For the

reasons that follow, the court grants the defendants' motion to dismiss.


## II.  BACKGROUND

### A.  Factual and Administrative Background

The development and use of genetically engineered animals for food and ornamental

purposes has become a fast-growing industry in recent years.  Am. Compl. ¶ 31.  Advancements

in the field of animal biotechnology, however, are tempered by concerns for the safety of

products derived from biotechnology and the impact of genetically engineered animals on their

environment.  Not surprisingly, genetically engineered animals, or animals with genes inserted

from another organism, are subject to a wide array of regulatory authority.[1]  Defs.' Mot. at 6-9.

Agencies involved in regulating biotechnological products include the EPA, the USDA and its

Animal and Plant Health Inspection Service ("APHIS"), and the FDA.  *Id*. at 8.

The FDA has broad authority under the FDCA to regulate various human health issues.

---

[1] In 1986, the Office of Science and Technology Policy ("OSTP") formed a committee which published the Coordinated Framework for the Regulation of Biotechnology.  Defs.' Mot. at 7; *see* 51 Fed. Reg. at 23, 302.  The Coordinated Framework, which uses existing statutory authorities to provide an ordered regulatory approach for genetically modified products, is predicated on the principle that genetic engineering should not be regulated as a *process*, but rather that the *products* of biotechnology should be regulated the same as products of any other technology, namely on a case-by-case basis.  Defs.' Mot. at 7-8.

In particular, under the NADA provisions of the FDCA, FDA is responsible for approving new animal drug products before their entry into the marketplace. 21 U.S.C. § 360b. The FDA has been regulating genetically engineered animals and their expression products as containing "new animal drugs" since at least 1998. Am. Compl. ¶ 31-32. For instance, in 2001, FDA began regulating genetically engineered salmon as a new animal drug. *Id.* ¶ 31. That same year, in an interagency effort later known as the Case Studies of Environmental Regulation for Biotechnology, FDA determined that the NADA provisions of the FDCA apply to genetically engineered ornamental fish. *Id.* ¶ 34.

At least one manufacturer, Yorktown Technologies, L.P. ("Yorktown"), has developed a line of genetically engineered ornamental or "pet" fish, hereinafter referred to by its trademarked name GloFish. *Id.* ¶ 35. The GloFish is a bright red fluorescent zebra fish that contains genetic constructs from sea coral, which cause the fish to glow under certain kinds of light. *Id.* Although GloFish are intended for use in home aquariums, the plaintiffs allege that they "could be put to other uses and readily enter the animal and human food chains through accidental or intentional releases." *Id.*

In the fall of 2003, Yorktown's CEO, Alan Blake, apparently contacted Defendant Matheson at the Center for Veterinary Medicine to ask about the FDA's views regarding GloFish.[2] Defs.' Mot. at 11; Pls.' Opp'n. at 4. In response to this inquiry, FDA reviewed materials provided by Yorktown to the public through its website

---

[2] Although paragraph 37 of the Amended Complaint alleges that during the fall of 2003, Yorktown "apparently requested approval for the GloFish from the FDA under the NADA provisions of the FDCA," it appears that Yorktown's contacts with FDA during fall 2003 were limited to a phone call and did not include the submission of a NADA for GloFish. *See* Defs.' Reply at 7, n. 6.

(http://www.glofish.com/science.asp.) and consulted directly with staff at the Animal and Plant

Health Inspection Service of the USDA.  Pls.' Opp'n. 4-5; Defs.' Mot. at 12.  After considering

the legal, scientific and policy issues involved in the commercialization of GloFish, FDA

determined that regulation would be inappropriate.  Pls.' Opp'n. 5; Defs.' Mot. at 12.

Accordingly, on December 9, 2003, FDA issued the following statement ("FDA's GloFish

Statement"):

> Because tropical aquarium fish are not used for food purposes, they pose no threat
> to the food supply.  There is no evidence that these genetically engineered zebra
> danio fish pose any more threat to the environment than their unmodified
> counterparts which have long been widely sold in the United States.  In the absence
> of a clear risk to the public health, the FDA finds no reason to regulate these
> particular fish.

Am. Compl. ¶ 38; Defs.' Mot. at 12.  The next day, Yorktown announced on its website that in

response to the FDA's decision not to regulate GloFish and due to unprecedented demand,

limited numbers of GloFish would be made available immediately, with nationwide sales

commencing shortly thereafter.  Am. Compl. ¶ 40.  On December 15, 2003, FDA met with at

least one of the plaintiffs[3] to discuss FDA's regulation of GloFish.  Am. Compl. ¶ 41; Defs.'

Mot. at 14.  Prior to this meeting, FDA consulted with staff at the United States Fish and Wildlife

Service ("FWS"), who indicated that, in their view, genetically engineered zebra danio fish were

not an invasive species hazard or a threat to endangered species.  Am. Compl. ¶ 42; Defs.' Mot.

12-13.

---

[3] It is not clear from the pleadings whether FDA met with "the plaintiffs," Am. Compl. ¶ 41,  or
with "[plaintiff] CFS and other consumer groups," Defs.' Mot. at 14.

## B.  Procedural History

On March 4, 2004, the plaintiffs filed an amended complaint seeking declaratory and injunctive relief.  The plaintiffs allege that: (1) FDA has arbitrarily and capriciously distinguished between food and non-food uses as it applies its NADA authority to GloFish; (2) FDA has arbitrarily and capriciously decided to treat the GloFish NADA application pursuant to a different presumption of safety, "the absence of a clear risk to the public health"; (3) FDA's failure to prepare an environmental impact statement ("EIS") or an environmental assessment prior to allowing the proposed commercialization of GloFish violates the proposal-specific requirements of NEPA; (4) FDA's actions with respect to genetically engineered ornamental fish, and other genetically engineered animals generally, violate the programmatic requirements of NEPA; (5) FDA's failure to prepare a biological assessment or complete consultation requirements prior to allowing the proposed commercialization of GloFish violates the proposal-specific requirements of ESA; and (6) FDA's actions with respect to genetically engineered ornamental fish, and other genetically engineered animals generally, violate the programmatic requirements of ESA.  *See* Am. Compl. ¶¶ 56-79.

In response, the defendants filed a motion to dismiss or, in the alternative, for summary judgment.[4]  The defendants moved to dismiss on several grounds.  First, the defendants argue that the plaintiffs lack standing because the alleged harms are based on conjectural and hypothetical injuries that fail to satisfy the requirement of Article III's "case-or-controversy" doctrine.  Defs.' Mot. at 19-24.  The defendants also argue that the plaintiffs' claims regarding

---

[4]  This court issued a Minute Order, dated July 22, 2004, directing the plaintiffs to file an opposition responding only to the defendants' arguments seeking dismissal and not to arguments raised on summary judgment.  Accordingly, the court will not address the defendants' arguments for summary judgment.

genetically engineered fish and animals should be dismissed for failure to satisfy the doctrines of ripeness and finality. *Id.* at 38-39.

With regard to the merits of the plaintiffs' claims, the defendants argue that this court should dismiss claims one and two because FDA's decision whether to regulate GloFish is committed to agency discretion. *Id.* at 24-30. The defendants also argue that this court should dismiss claims three and four because FDA has not taken a "major federal action" as required by NEPA. *Id.* at 30-33. Finally, the defendants argue that this court should dismiss claims five and six because FDA has not engaged in "agency action" as required by ESA. *Id.* at 33-38. The court now turns to the defendants' motion to dismiss.

## III. ANALYSIS

### A. Justiciability Arguments

Before the court can address the merits of the plaintiffs' claims, it must first resolve the justiciability issues raised by the defendants. The defendants argue that the plaintiffs lack standing to bring their claims and that the plaintiffs' claims concerning genetically engineered fish and animals are not ripe for review because there has been no final agency action. The court addresses each claim in turn.

### 1. Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Consequently, "a showing of standing is an essential and

unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Id.* On a motion for summary judgment, however, the "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (citing Federal Rule of Civil Procedure 56); *accord Fla. Audubon*, 94 F.3d at 666.

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001). Nor is

there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

The test for standing shifts focus when a plaintiff challenges an agency's failure to comply with a procedural requirement. *Fla. Audubon*, 94 F.3d at 664 (citing *Defenders of Wildlife*, 504 U.S. at 572 n.7). In such cases, as long as the procedural requirement is designed to protect a threatened, concrete interest of the plaintiff, the violation is sufficient to grant the plaintiff standing. *City of Waukesha*, 320 F.3d at 234. To ensure that the plaintiff's interest is more than a general interest common to all members of the public, however, the procedural-rights plaintiff must show "that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* (citing *Fla. Audubon*, 94 F.3d at 664).

If the plaintiff is an association, it may demonstrate standing as long as "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. Fed. Communications Comm'n*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).[5] Finally, if the plaintiff is suing under the APA, the plaintiff must show that the alleged injury falls within the zone of interests that the statute on which the plaintiff bases the

---

[5] As a corollary to representational standing, a plaintiff that is an organization must satisfy the same standing requirements that apply to individuals. *See Am. Legal Found. v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987) (citing *Havens RealtyCorp. v. Coleman*, 455 U.S. 363, 378-79 (1982)). Here, plaintiff International Center for Technology Assessment asserts organizational standing, and plaintiffs Center for Food Safety and Sierra Club assert representational standing. Because the defendants do not raise any specific arguments relating to organizational or representational standing of the plaintiffs, the court only addresses the constitutional and prudential elements of standing.

complaint seeks to protect.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Fed'n for*

*Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996).

### 2. The Plaintiffs Allege Facts Sufficient to Establish Standing

In the instant case, the amended complaint alleges that the defendants' refusal to regulate

genetically engineered ornamental fish and their failure to conduct NEPA and ESA compliance

with respect to the regulation of GloFish and other genetically engineered animals causes the

plaintiffs "environmental, health, aesthetic, and other injuries resulting from the

commercialization and use of such animals."  Am. Compl. ¶ 12.  These injuries include "the

consumption of genetically engineered animals" resulting from their accidental and/or purposeful

use in the human food supply and "aesthetic injury from viewing genetically engineered GloFish

and other animals in aquaria and other captive situations."  *Id.*

According to the defendants, the plaintiffs' allegations fail to satisfy the "injury in fact"

prong of the *Lujan* test for Article III standing because the alleged harms are "conjectural and

hypothetical injuries" that "are not sufficiently concrete to establish injury in fact."  Defs.' Mot.

at 23.  The defendants argue that because the plaintiffs have "not establish[ed] that GloFish have

been or will be introduced into any waters in the United States, or that GloFish would harm the

environment or injure plaintiffs if they were to survive after such an introduction," plaintiffs have

failed to satisfy the minimum constitutional requirements of Article III's "case-or-controversy"

doctrine.  Defs.' Reply at 4; *see also* Defs.' Mot. at 4.

Initially, the court notes that the plaintiffs have alleged that ornamental fish such as the

zebra danio used to create GloFish "are routinely dumped into marine and fresh water bodies by

aquarium owners who no longer wish to keep them."  Pls.' Opp'n at 6; *see also* Pls.' Opp'n,

Attach. 6 ("Williams Decl.") ¶ 4 (explaining that it is "commonly accepted among aquatic biologists that almost every species maintained in home aquaria will at some time or other be dumped and released into U.S. waters by some hobbyist, or through releases from aquarium fish culture facilities").[6]  In evaluating a motion to dismiss for lack of standing, this court must accept the factual allegations in the complaint as true.  *Information Handling Serv., Inc. v. Def. Automated Printing Serv.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  Because Yorktown is currently selling GloFish in various states throughout the United States, the court assumes that GloFish have been or will be introduced into waters in the United States.

Contrary to the defendants' assertions, the plaintiffs do not need to show that "any form of zebra danio, including GloFish, would survive in a way that would have any environmental impact" in order to establish standing for this court.  Defs.' Reply at 4.  It is enough that the plaintiffs "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 181 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  In *Friends of the Earth*, the injury to the organizational plaintiffs stemmed from the defendant's discharge of pollutants into a river.  Despite the fact that the District Court had found that there had been "no demonstrated proof of harm to the environment" from the defendant's actions, 956 F.Supp. 588, 602 (D.S.C. 1997), the Supreme Court held that the organizational plaintiffs had sufficiently alleged an injury in fact because the discharges affected the members' "recreational, aesthetic, and economic interests" and, as the court noted, "[t]he relevant showing for purposes

---

[6]  When ruling on a motion to dismiss, a court may look to supporting affidavits to establish standing.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

Here, the plaintiffs have asserted that their members' "aesthetic and recreational interests in enjoying warm tropical waters and consuming freshwater fish" are threatened due to the failure of the defendants to adequately review GloFish. Pls.' Opp'n at 8. For example, "Declarant Hughes regularly snorkels in Blue Springs State Park in Northern Florida and kayaks in the Everglades. She has a 'deep respect and curiosity for aquatic biodiversity' and appreciates the 'unique fish and wildlife native to the Everglades.'" *Id.* (citing Pls.' Opp'n, Attach. 2 ("Hughes Decl.") ¶¶ 4-5). Because the defendant's actions affect the plaintiff members' recreational and aesthetic interests, the court determines that the plaintiffs have sufficiently alleged "injury in fact" for purposes of Article III standing.[7]

Additionally, the plaintiffs' alleged harm falls within the zone of interests protected or regulated by the FDCA. The zone of interests test "is not meant to be especially demanding," excluding only those whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n.,* 479 U.S. 388, 399 (1987). In this case, the plaintiffs allege that "the imminent release of genetically engineered ornamental fish into the environment and the consumption of them by other carnivorous fish as part of the food chain" compels the plaintiffs' "involuntary consumption of genetically engineered ornamental fish that have not been approved as safe for use as human or animal food." Am. Compl. ¶ 10. Because

---

[7]   The defendants raise no arguments concerning causation and redressability apart from their contention that the court "need not consider whether prongs two and three of the *Lujan* test have been met because plaintiffs have insufficiently alleged prong one – injury in fact." Defs.' Mot. at 23. The court concludes that causation and redressability have been met in this case.

the purpose of the FDCA is to protect consumers from the risks of consuming unsafe or ineffective food and drugs, this allegation is sufficient to bring the plaintiffs within the zone of interests protected by the FDCA.  21 U.S.C. § 393(b) (setting forth FDA's mission statement, which among other things indicates that FDA "shall . . . promote the public health by ensuring that . . . drugs are safe and effective").

While the defendants do not raise specific challenges to standing under NEPA, 42 U.S.C. §§ 4321-4370d, and the ESA, 16 U.S.C. §§ 1531-1544, the court also examines the plaintiffs' standing under these statutes.  NEPA and ESA are statutes that apply to all federal actions that may affect the environment or certain wildlife species.  *Id*.  To have standing under NEPA, which confers a procedural right, "the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff."  *Fla. Audubon*, 94 F.3d at 664-65.  The court also notes that because NEPA does not provide a private cause of action to enforce the procedural requirement of producing an EIS, the plaintiffs must base their right to sue on another basis.  *Id*. at 665.  Here, the plaintiffs seek to enforce NEPA through the APA.  Am Compl. ¶¶ 67, 73.  "In order to invoke judicial review of an alleged NEPA violation under the APA, a private individual must be 'adversely affected or aggrieved . . . within the meaning' of NEPA by some final agency action."  *Florida Audobon*, 94 F.3d at 665 (quoting *Lujan*, 497 U.S. at 882-83 (1990)).  The D.C. Circuit also instructs that "to be adversely affected within NEPA [the plaintiffs] must demonstrate that they can satisfy all constitutional standing requirements and that their particularized injury is to interests of the sort protected by NEPA").  *Id*.  While, as discussed below, the FDA's action is not "final" in the sense of an irretrievable commitment of resources, a court may review a case where agency

inaction has the same impact on the rights of the plaintiffs as a denial of relief. *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987). In addition, agency inaction is reviewable when an agency violates a duty to act. *Id.* In contrast, ESA's citizen-suit provision negates the zone-of-interests test of prudential standing by broadly providing that "any person may commence a civil suit" to enforce ESA. *Bennett v. Spear*, 520 U.S. 154, 164 (1997).

Here, the procedural harm alleged by the plaintiffs is the FDA's failure to adequately review the environmental harm caused by GloFish and other genetically engineered animals. Pls.' Opp'n at 15. As noted, the plaintiffs claim that this procedural breach results in the release of GloFish into the environment, and that such a release threatens the plaintiffs' particularized recreational and aesthetic interests. *See, e.g.*, Hughes Decl. ¶¶ 4-5. Recreational use and aesthetic interest are among the interests NEPA is designed to protect. *Lujan*, 497 U.S. at 886. Finally, as stated above, the citizen suit provision in the ESA eliminates any prudential requirement for the plaintiffs' claims brought pursuant to the act. *Am. Soc. for the Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus*, 317 F.3d 334, 336 (D.C. Cir. 2003). In sum, because the plaintiffs' allegations satisfy the constitutional and prudential standing requirements under all three statutes and have standing to bring this action on behalf of their members, the court holds that the plaintiffs have standing to bring this lawsuit.

### 3. Ripeness and Finality

The defendants argue that this court should dismiss the plaintiffs' claims "relating to genetically engineered fish and animals in general, as opposed to GloFish specifically, for lack of subject matter jurisdiction and failure to state a claim under the APA because there has been no final agency action and plaintiffs' claims are therefore not ripe for judicial review." Defs.' Mot.

-13-

at 38.  Although the defendants raise this argument only after developing several other

arguments, the court must consider all issues relating to jurisdiction as a threshold matter.  *See,*

*e.g.*, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95 (1998).

The only claims that relate to genetically engineered animals "in general," as opposed to

GloFish "specifically," are claims four and six, which challenge the defendants' failure and

refusal to comply with NEPA's and ESA's requirements for programmatic actions.[8]  Specifically,

claims four and six allege that the defendants have taken a concerted series of actions that

constitute a new, distinctive, and unprecedented program for genetically engineered animals.

Am. Compl. ¶¶ 70-72, 78.  In this regard, the plaintiffs point to a number of specific, discrete

actions that the FDA has taken, such as participating in the CEQ/OSTP Case Studies and issuing

warning letters to universities regarding the disposition of genetically engineered animals, to

argue that such programmatic actions require compliance with NEPA and ESA.  *Id*. ¶ 50.

The defendants argue that these claims are not ripe for review because "the federal

government as a whole, as well as FDA specifically, is currently actively considering the

appropriate approach for the regulation of genetically engineered animals."  Defs.' Mot. at 39.

Thus, "[c]ourt intervention at this early stage would be tantamount to judicial entanglement in

abstract disagreement over administrative policies."  *Id*.  But, this argument fails because "a

person with standing who is injured by a failure to comply with NEPA procedure may complain

of that failure at the time the failure takes place, for the claim can never get riper."  *Ohio*

---

[8]  Indeed, because the parties address all arguments concerning ripeness and finality in the
context of claim four (Programmatic NEPA Requirements) and claim six (Programmatic ESA
Requirements) only, *see* Pls.' Opp'n at 38 and Defs.' Reply at 18, this court assumes that the defendants
are not challenging the ripeness or finality of the plaintiffs' proposal-specific NEPA and ESA claims or
the plaintiffs' claims regarding GloFish under the FDCA.

*Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998).  Similarly, a claim that an agency

has violated ESA's procedural requirements becomes ripe when the alleged procedural violation

occurs, assuming the plaintiff has standing to bring the claim.  *Sierra Club v. United States Dep't*

*of Energy*, 287 F.3d 1256, 1263-64 (10th Cir. 2002); *see also Wyoming Outdoor Council v. U.S.*

*Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999) (holding that a person who is injured by a failure

to comply with a procedural requirement may complain at the time the failure takes place).  Here,

the amended complaint alleges that the FDA has failed to conduct programmatic NEPA and ESA

compliance for its actions relating to genetically engineered animals.  Since the alleged

procedural violations of NEPA and ESA have already occurred, the court holds that such claims

are ripe for review.  The court now turns to the merits of the plaintiffs' claims.

### B.  Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies

outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377

(1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen.*

*Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a

court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action

of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of*

*Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des*

*Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject-matter

jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court

has subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The

court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### C.  Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48

(internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his

prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or

"plead law or match facts to every element of a legal theory."  *Krieger v. Fadely*, 211 F.3d 134,

136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a

complaint for failure to state a claim unless the defendant can show beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Warren*

*v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040.

Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations

– including mixed questions of law and fact – as true and draw all reasonable inferences

therefrom in the plaintiff's favor.  *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir.

2003); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir.

2003); *Browning*, 292 F.3d at 242.  While many well-pleaded complaints are conclusory, the

court need not accept as true inferences unsupported by facts set out in the complaint or legal

conclusions cast as factual allegations.  *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

**D.  The Court Dismisses Claims One and Two Because FDA's Decision Not to Regulate
    GloFish or Other Genetically Engineered Fish is Committed to Agency Discretion**

In claim one, the plaintiffs allege that the FDA "arbitrarily and capriciously denied

regulatory authority over the GloFish by distinguishing between food and non-food uses" in its

GloFish Statement.  Am. Compl. ¶ 58.  In claim two, the plaintiffs allege that the FDA "failed to

review" Yorktown's apparent request for approval of the GloFish under the NADA provisions of

the FDCA and instead "arbitrarily and capriciously . . . treat[ed] the GloFish NADA application

pursuant to a different threshold regulatory standard, the 'absence of a clear risk to the public

-17-

health.'" *Id.* ¶¶ 61, 62.   These claims must be dismissed because the FDA's enforcement

decisions relating to unapproved new animal drug products are discretionary and are not subject

to judicial review under the APA.

The APA entitles "a person suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action . . . to judicial review thereof."  5 U.S.C. § 702.  Under

the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706; *Tourus Records,*

*Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001).  A court may not review

an agency action, however, where "(1) statutes preclude judicial review; or (2) agency action is

committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821,

828 (1985).  The APA's ban on judicial review of such actions is jurisdictional.  *Balt. Gas &*

*Elec. Co. v. Fed. Energy Regulatory Comm'n*, 252 F.3d 456, 459 (D.C. Cir. 2001) (holding that

"[t]he ban on judicial review of actions 'committed to agency discretion by law' is

jurisdictional"); *Patent Office Prof'l Ass'n v. Fed. Labor Relations Auth.*, 128 F.3d 751, 753

(D.C. Cir. 1997) (noting that the APA provides no jurisdiction when "statutes preclude judicial

review").

"[A]n agency's decision not to prosecute or enforce, whether through civil or criminal

process, is a decision generally committed to an agency's absolute discretion."  *Chaney*, 470 U.S.

at 831.  This presumption of unreviewability applies because an agency decision not to enforce

> often involves a complicated balancing of a number of factors which are peculiarly
> within its expertise . . . including whether a violation has occurred, . . . whether
> agency resources are best spent on this violation or another, whether the agency is
> likely to succeed if it acts, whether the particular enforcement action requested best
> fits the agency's overall policies, and, indeed, whether the agency has enough
> resources to undertake the action at all.

*Id.*; *see also Nat'l Wildlife Fed'n v. Envtl. Prot. Agency*, 980 F.2d 765, 772-73 (D.C. Cir. 1992).

Moreover, the agency "is far better equipped than the courts to deal with the many variables

involved in the proper ordering of its priorities." *Shell Oil Co. v. Envtl. Prot. Agency*, 950 F.2d

741, 764 (D.C. Cir. 1991) (quoting *Chaney*, 470 U.S. at 831-32).  That said, the presumption

may be overcome

> (1) where the substantive statute has provided guidelines for the agency to follow in
> exercising its enforcement powers; (2) where the agency refuses to institute
> proceedings based solely on the belief that it lacks jurisdiction; and (3) where the
> agency has conspicuously and expressly adopted a general policy that is so extreme
> as to amount to an abdication of its statutory responsibilities.[9]

*Balt. Gas & Elec.,* 252 F.3d at 460 (quoting *Chaney*, 470 U.S. at 833 & n.4).  Courts therefore

must carefully examine the statute on which the claim is based.  *Webster v. Doe*, 486 U.S 592,

600 (1988).

### 1.  The NADA Provisions of the FDCA

The FDCA vests the authority to approve new animal drugs in the Secretary of Health and

Human Services, who, in turn, has delegated that authority to FDA through the Commissioner of

Food and Drugs.  21 C.F.R. § 5.10.  Under the FDCA, a new animal drug is defined as "any drug

intended for use for animals other than man, including any drug intended for use in animal feed .

. ." 21 U.S.C. § 321(v).  The term "drug" is defined, in relevant part, as "articles intended for use

in the diagnosis, cure, mitigation, treatment, or prevention of disease in animals; and . . . articles

(other than food) intended to affect the structure or any function of the body of man or other

---

[9]  "In *Chaney*, the Court endorsed only the first of these three exceptions but noted the possibility
of the other two, 'express[ing] no opinion on whether such decisions would be unreviewable' but
'not[ing] that in those situations the statute conferring authority on the agency might indicate that such
decisions were not committed to agency discretion.'"  *Balt. Gas & Elec.*, 252 F.3d at 460 n.2 (quoting
*Chaney*, 470 U.S. at 833 n.4).

animals . . ."  21 U.S.C. § 321(g)(1).

All new animal drugs are presumed to be unsafe and adulterated unless the drug's

sponsor submits, and the FDA approves, a NADA.  *Id*. at §360b(a).  A NADA is required to

contain a wide array of information, such as investigation reports, drug components and

composition, methods of manufacturing, proposed labeling, and withdrawal periods.  *Id*. at §

360b(b)(1).  In order to obtain FDA approval, a sponsor must demonstrate, among other things,

that the drug is safe and effective for its intended uses.  *Id*. at § 360b(b); 21 C.F.R. § 514.1(b).

Moreover, if the product is intended to be used in a food-producing animal, the sponsor must also

demonstrate that the new animal drug product is safe for human consumption and that the edible

animal products remain free of unsafe drug residues.  21 U.S.C. § 360b(d)(2); 21 U.S.C. § 514.1.

Just because a drug is presumed unsafe under the FDCA, however, does not mean that it

cannot be sold.  Rather, "[w]hen animal drug products are introduced into the marketplace

without prior review, the FDA must decide whether and how to initiate enforcement

proceedings."  *Schering Corp. v. Heckler*, 779 F.2d 683, 684 (D.C. Cir. 1985).  Stated

differently, a manufacturer may sell an unapproved animal drug, but that manufacturer proceeds

at its own risk because any animal drug that has not been approved by the FDA is subject to

potential seizure and condemnation.  21 U.S.C. § 334.

## 2.  The FDA's Actions are not Subject to Judicial Review

The plaintiffs contend that by not regulating GloFish, the defendants have violated  21

U.S.C. § 360b(a)(1), which states that "a new animal drug shall . . . be deemed unsafe . . . unless

(A) there is in effect an approval of an application . . . with respect to such use or intended use of

such drug, and such drug, its labeling, and such use conform to such approved application."  21

U.S.C. § 360b(a)(1).  Specifically, the plaintiffs argue that the defendants have violated §

360b(a)(1) because the GloFish statement is "a final determination allowing the

commercialization of the GloFish without fear of future enforcement action" and a "final agency

action deeming the GloFish safe[.]"  Pls.' Opp'n at 19.  The plaintiffs overstate the defendants'

action.  The GloFish statement merely indicates the defendants' decision to refrain from

regulating or taking enforcement action against GloFish at the present time.  There is no

indication that the defendants are affirmatively endorsing GloFish as "safe" under the FDCA, or

that they are granting GloFish NADA approval.  The key to this argument is the fact that the

manufacturer of GloFish, Yorktown Technologies, never submitted a NADA for GloFish.[10]

Thus, the defendants actions are simply a decision not to exercise enforcement authority.  This

decision "presumptively lies beyond the reach of APA review as an action 'committed to agency

discretion by law.'"  *Schering*, 779 F.2d at 686 (quoting 5 U.S.C. § 701(a)(2)).

As noted, the presumption against judicial review is overcome only "where the

substantive statute has provided guidelines for the agency to follow in exercising its enforcement

powers."  *Chaney*, 470 U.S. at 833.  Here, the plaintiffs argue that FDCA provides guidelines for

enforcement because "[t]he statutory provisions of §360b and the regulatory standards

implemented by the FDA provide the Court with standards upon which to judge the agency's

action."  Pls.' Opp'n at 23.[11]  But, the statutory standards in § 360b that the plaintiffs reference

---

[10] The Plaintiffs state that they dispute this fact, *see* Pls.' Opp'n at 24, but the plaintiffs' subsequent filing apparently concedes that Yorktown never actually submitted a NADA.  *See* Defs.' Reply at 7, n.6; *supra* n.3.  Rather, the plaintiffs seem to urge the court to treat informal contacts between Yorktown and the FDA as a submission of a NADA.  The court declines to make this determination.

[11] For example, the plaintiffs point to 21 U.S.C. §360b(d)(2), which requires the FDA to consider four specific factors when assessing the safety of a new animal drug as proof that there is a meaningful standard upon which to review the FDA's actions.  Pls.' Opp'n at 23.

relate only to the procedures and standards by which the FDA may approve a new animal drug *when a NADA is submitted*. *Id*. (citing 21 U.S.C. § 360b(d)(2)).  When no NADA has been submitted, as is the case here, *Schering* makes clear that "in new animal drug cases, there are no statutory guidelines compelling the agency to investigate or pursue enforcement actions within any specified time frame."  *Schering*, 779 F.2d at 868.  Therefore, the defendants' actions here in refraining from enforcing FDCA is an unreviewable decision.  *Id*.

 Also this is not a case "where the agency refuses to institute proceedings based solely on the belief that it lacks jurisdiction." *Balt. Gas & Elec*., 252 F.3d at 460 (quoting *Chaney*, 470 U.S. at 833 & n. 4).  Although the plaintiffs have inserted this argument throughout their amended complaint,[12] the GloFish statement itself makes clear that the FDA is not declining to regulate GloFish under the misguided belief that it lacks jurisdiction.  Rather, as the court has already concluded, the FDA is simply exercising its discretion not to take enforcement actions against these particular fish.

Finally, this is not a case in which the FDA has implemented a policy of non-enforcement that amounts to "an abdication of its statutory responsibilities."  *Id*.  The plaintiffs argue that the FDA's GloFish Statement takes "an unequivocal position on the safety of a new animal drug without first taking the mandatory steps of the full regulatory review process" and that such a "failure to act in a manner consistent with the mandates of its authorizing statute is clearly reviewable."  Pls.' Opp'n at 20, 22.  But the FDA's actions cannot be characterized as an

---

[12]  *See, e.g.,* Am. Compl. ¶ 39 (stating that "FDA has asserted that it does not have authority under the FDCA to regulate the GloFish or other genetically engineered ornamental fish"); *Id* . ¶ 58 (contending that "FDA has . . . denied regulatory authority over the GloFish"); *Id*. ¶ 62 (stating that "[i]n acting not to assert jurisdiction over the GloFish . . .").

"abdication" of a "mandatory statutory duty" because the FDCA authorizes, but does not

mandate enforcement action.  *Schering*, 779 F.2d at 686.

In sum, the FDA's GloFish Statement amounts to neither a denial of regulatory authority

nor an affirmation of GloFish's safety under the FDCA.  Rather, the FDA's GloFish Statement is

a legitimate exercise of enforcement discretion that embodies "precisely the sort of balancing of

agency priorities and objectives" that, "absent some 'law to apply,' should not be second-guessed

by a court."  *Schering*, 779 F.2d at 686 (quoting *Chaney*, 470 U.S. at 1656-57).  Because the

decision not to take enforcement actions against GloFish is committed to agency discretion, the

court lacks jurisdiction over claims one and two, and the plaintiffs cannot prove any set of facts

in support of claims one and two which would entitle them to relief.  *Balt. Gas & Elec. Co.*, 252

F.3d at 459; *Empagran S.A.*, 315 F.3d at 343.  Therefore, the court dismisses counts one and two.

### E.  The Court Dismisses Claims Three and Four Because FDA's Actions Concerning GloFish and Other Genetically Engineered Animals do not Constitute a "Major Federal Action" Under NEPA

In claim three, the plaintiffs allege that the defendants have violated proposal-specific NEPA

requirements by failing to prepare an EIS or an environmental assessment for their actions in

allowing the commercialization of GloFish.  Am. Compl. ¶¶ 64-67.  In claim four, the plaintiffs

allege that the defendants have violated programmatic NEPA requirements by failing to prepare an

EIS or an environmental assessment for their actions with respect to genetically engineered

ornamental fish and genetically engineered animals generally.  Am. Compl. ¶¶ 68-73.  Both of these

claims fail to state a claim under NEPA because FDA has not taken a major federal action.

### 1.  The National Environmental Policy Act

Congress enacted NEPA to encourage a productive and enjoyable harmony between humans

and the environment.  42 U.S.C. § 4331.  Towards this end, NEPA imposes procedural

requirements, not substantive ones.  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371

(1989) (stating that "NEPA does not work by mandating that agencies achieve particular substantive

environmental results.")  Specifically, NEPA requires federal agencies to prepare an EIS if the

agency plans to undertake a "major" action "significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(C).  These environmental impact statements must include: (1) a

discussion of the environmental impact of the proposed action, (2) any adverse environmental

effects which cannot be avoided should the proposal be implemented, (3) alternatives to the

proposed action, (4) the relationship between local short term uses of man's environment and the

maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable

commitment of resources which would be involved in the proposed action should it be

implemented.  *Id*. at § 4332(2)(c).

## 2.  There is No "Major Federal Action" Triggering NEPA Compliance

A "threshold question" for determining whether NEPA applies is whether the agency has

engaged in a "major federal action."  *Macht v. Skinner*, 916 F.2d 13, 15-16 (D.C. Cir. 1990).  NEPA

regulations, written by the Council on Environmental Quality ("CEQ"), define "major federal

action" as including the "[a]doption of official policy[,] . . . [a]doption of formal plans[,]. . .

[a]doption of programs[,] . . . [and][a]pproval of specific projects."[13]  40 C.F.R. § 1508.18(b)(1-4).

For major federal actions, agencies must either prepare an EIS examining the environmental impact

of the proposed action, prepare an environmental assessment to determine whether there will be a

---

[13] A "major federal action" can include the circumstance where an official fails to act, but that
inaction must be reviewable under the APA.  40 C.F.R. § 1508.18.  As noted *supra*, refraining from
enforcement is not judicially reviewable.

significant environmental impact,[14] or claim that the action falls within a Categorical Exclusion, "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. In contrast, if the agency has not engaged in a major federal action, NEPA requirements do not apply. *Macht*, 916 F.2d at 16; *see also* 42 U.S.C. § 4332(2)(c) (requiring compliance only for "proposals for legislation and other major federal actions").

"In order to trigger the NEPA requirement of an EIS, the agency must be prepared to undertake an 'irreversible and irretrievable commitment of resources to an action that will affect the environment." *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 174 (D.D.C. 2000) (quoting *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 49 (D.C. Cir. 1999)). Agency decisions that maintain the status quo do not constitute major federal actions. *Id*. Moreover, "NEPA applies only to agency actions 'even if inaction has environmental consequences.'" *Id*. at 174-75 (quoting *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1243 (D.C. Cir. 1980)). In holding that the Secretary's failure to act did not constitute a major federal action, the court explained that "[n]o agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had power to act but did not do so." *Id.* at 1246.

Here, the NEPA requirements do not apply because the defendants have not engaged in any major federal action. According to the plaintiffs, the defendants have engaged in a "major Federal action" triggering NEPA compliance because they have "authorized the sale of a genetically engineered fish that has the potential to significantly impact public health, animal health, and the environment." Pls.' Opp'n at 31. However, the FDA never expressly "authorized" the sale of

---

[14] An "environmental assessment" is a public document that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS." 40 C.F.R. § 1508.9.

GloFish; rather, the agency has simply declined to initiate enforcement proceedings against its manufacturer. FDA's decision not to regulate GloFish maintains the status quo because GloFish are not being regulated any differently after the GloFish Statement than before it was issued. *Alliance for Bio-Integrity* at 174. In addition, the FDA has not made an "irreversible and irretrievable commitment of resources" to the regulation of GloFish or the regulation of genetically engineered animals in general that would trigger NEPA's requirements. *Id*. To the contrary, the FDA's GloFish Statement is indicative that no resources are being committed to regulate GloFish because the GloFish Statement explicitly states that FDA "finds no reason to regulate these particular fish."

In addition, the plaintiffs' programmatic NEPA claim fails because the FDA's actions with respect to genetically engineered animals do not constitute activities sufficiently "systematic and connected" to require a programmatic EIS. *Found. on Econ. Trends v. Lyng*, 817 F.2d 882 (D.C. Cir. 1987); *see also* 40 C.F.R. § 1508.18(b)(3). A programmatic EIS analyzing the cumulative impact of agency activities is only necessary where the proposals for federal action "are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a). "Connected actions" are "closely related," and thus to be treated in one statement, "if they: (i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; and (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1).

Here, the plaintiffs have alleged nothing more than a series of discrete actions by the FDA that do not amount to an "animal biotechnology program" requiring a programmatic EIS. The plaintiffs maintain that the defendants have considered dozens of proposals before them to

commercialize a broad variety of genetically engineered animals, participated in and endorsed

CEQ/OSTP Case Studies, issued warning letters to universities regarding the disposition of

genetically engineered animals, and made numerous public announcements regarding its regulatory

approach for genetically engineered animals.  Am. Compl. ¶ 50.  But these actions are not

interdependent or closely related enough to be, in effect, a single course of action so as to require a

programmatic EIS.  *See Lyng*, 817 F.2d at 884-86 (holding that the United States Department of

Agriculture's vast array of animal productivity research projects were not sufficiently interrelated or

interdependent to have been, in effect, a single course of action that required a programmatic EIS

under NEPA).  The court in *Lyng* explained that the USDA's actions consisted of projects too

diverse and discrete because, among other things, "[a]pproval of one project does not insure

approval of technologically similar projects."  *Id.* at 884.  Here, the FDA's actions with respect to

genetically engineered animals are discrete and independent in nature.  Thus, NEPA's

programmatic requirements are not triggered.

In sum, because the FDA's GloFish Statement is reversible, maintains the substantive status

quo, and takes no overt action, the GloFish Statement does not constitute a major federal action

under NEPA.  Therefore, the FDA was not required to prepare an EIS in conjunction with the

GloFish Statement.  The programmatic claim fails because the FDA has not engaged in a single

course of action.  Accordingly, the court dismisses claims three and four for failure to state a claim

on which relief can be granted.  *Warren*, 353 F.3d at 37.

**F.  The Court Dismisses Claims Five and Six Because FDA's Actions Concerning GloFish and
     Other Genetically Engineered Animals Do Not Trigger ESA's Requirements**

In claim five, the plaintiffs allege that the defendants have violated proposal-specific ESA

requirements by failing "to prepare a biological assessment, or to complete formal or informal consultation with the FWS" before allowing the commercialization of GloFish.  Am. Compl. ¶ 75. In Claim 6, the plaintiffs allege that the defendants have violated programmatic ESA requirements by failing to consult with FWS to ensure "that their programs regulating all genetically engineered ornamental fish, and . . . all genetically engineered animals, are not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of critical habitat."  Am. Compl. ¶ 78.  Both of these claims fail to state a claim under ESA because the plaintiffs have failed to sufficiently allege an agency action triggering ESA compliance.

### 1.  The Endangered Species Act

The ESA is comprehensive legislation for the preservation of endangered species.  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  Under the ESA, the Secretary of the Interior, acting through the FWS, lists those fish, wildlife or plant species he has determined to be endangered or threatened.  16 U.S.C. § 1533(a); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003).  Section 7 of the ESA directs each federal agency to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2).  To carry out this duty, an agency considering whether to implement a proposed action works closely with the FWS.  At the outset, the agency must ask the FWS whether a listed species is present in the area of the proposed action. 16 U.S.C. § 1536(c); *Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585, 596 (D.C. Cir.1994).  If the FWS responds affirmatively, the agency must complete a biological assessment to identify the species the action is likely to affect.  *Id.*  If the agency's assessment indicates that the proposed action "may affect" listed species or critical habitat, the agency must

initiate "formal consultation" with the FWS.  16 U.S.C. § 1536(a); 50 C.F.R. § 402.14; *Rancho Viejo*, 323 F.3d at 1064.  At the end of formal consultation, the FWS issues a biological opinion that sets forth a determination indicating whether the proposed action is likely to jeopardize the continued existence of a listed species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(h)(3); *Rancho Viejo*, 323 F.3d at 1064.  If the FWS makes a determination that "jeopardy" exists, the biological opinion must set forth "reasonable and prudent alternatives" aimed at avoiding such consequences. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3); *Rancho Viejo*, 323 F.3d at 1064.  If the FWS finds no jeopardy, it nonetheless must provide the agency with a statement indicating any incidental take of the species resulting from the proposed action and setting forth reasonable and prudent measures to minimize that take.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  The FWS also may offer conservation recommendations.  *Id*. § 402.14(j).  In certain situations, no formal consultation is necessary.  The agency and the FWS may engage in informal consultation to assist the agency in determining whether formal consultation is required.  50 C.F.R. § 402.13.  Should the agency determine from this informal consultation that the proposed action is not likely to adversely affect any listed species and the FWS concurs, the agency need not initiate formal consultation.  *Id.* § 402.14(b); *Ala. Power Co. v. Fed. Energy Regulatory Comm'n*, 979 F.2d 1561, 1564 (D.C. Cir.1992).  At that point, "the consultation process is terminated, and no further action is necessary."  50 C.F.R. § 402.13(a).

## 2.  There is No "Agency Action" Triggering ESA Compliance

A threshold requirement for stating a claim under ESA is that the agency engaged in an "agency action."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.03 (the consultation requirement in Section 7 of ESA is limited to agency "actions in which there is discretionary Federal involvement

or control."); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998).  "Agency

action" is defined by ESA as "any action authorized, funded, or carried out by" a federal agency.  16

U.S.C. § 1536(a)(2); *see Marbled Murrelet v. Babbit*, 83 F.3d 1068, 1075 (9th Cir. 1996).

Examples of agency action "include, but are not limited to . . . actions intended to conserve listed

species or their habitat; . . . the promulgation of regulations; . . . [and] actions directly or indirectly

causing modifications to the land, water, or air."  50 C.F.R. § 402.02.  Indeed, "[t]he standards for

'major federal action' under NEPA and 'agency action' under ESA are much the same."  *Marbled

Murrelet*, 83 F.3d at 1073.

Like the plaintiffs' arguments in the previous claims, the resolution of the ESA claims turns

on the plaintiffs' characterization of the defendants' actions.  The plaintiffs allege that "FDA'a

GloFish safety determination and resulting approval of Yorktown's commercialization proposal was

'action' that was 'authorized' and 'carried out' by the defendants."  Pls.' Opp'n at 33 (quoting 16

U.S.C. § 1536(a)(2)).  However, as the court has already concluded, the GloFish Statement is

merely an expression of an intent not to engage in enforcement activity.  Consequently, it is clear

that the defendants have not engaged in an "agency action" triggering ESA compliance.  *Fund for

Animals*, 127 F.3d at 84 n.6 (noting that promulgation of policy to refrain from regulating a

particular subject matter "most probably would have been no 'agency action' to trigger the ESA

consultation requirement").  Thus, the court dismisses claims five and six for failure to state a

claim.  *Warren*, 353 F.3d at 37.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 30th day of March, 2005.

RICARDO M. URBINA
United States District Judge